### The Spring Valley Coal Company v. Annie Greig.

#### Gen. No. 4,694.

1. Mine and Miners Act—*to what provisions of, apply.* The provisions of the Mine and Miners Act relate to the mine property both above and below the surface of the earth.

2. Constitutional questions—*waived by appealing to Appellate Court.* The Appellate Courts have no power to determine constitutional questions, and by appealing to that court the right to raise constitutional questions is waived.

Action to recover damages for death caused by alleged wrongful act. Appeal from the Circuit Court of Bureau county; the Hon. Samuel C. Stough, Judge, presiding. Heard in this court at the April term, 1906. Affirmed. Opinion filed November 9, 1906.

McDougall, Chapman & Bayne, for appellant.

J. L. Murphy and William Hawthorne, for appellee.

The Spring Valley Coal Co. v. Greig.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Appellee sued the Spring Valley Coal Company to recover damages caused by the death of her husband. The case was tried upon the first and second counts of the declaration, which alleged that appellant owned and operated a coal mine known as mine No. 1, at Spring Valley; described minutely the machinery and appliances involved in this case; charged that the appellee's husband, James Greig, was in appellant's employ as engineer of the retail chute engine, and that it was the duty of the appellant and its officers and representatives operating and managing the mine to comply with the statute of the State of Illinois relating to coal mines, and not to wilfully fail to comply with any of its provisions, and to see that all dangerous places above and below were properly marked, and danger signals displayed wherever required, and that at the date of her husband's death, and for a long time prior thereto, the defendant wrongfully and wilfully failed and neglected to cause the dangerous places in said declaration described to be properly marked, and to cause danger signals to be displayed thereat; and the declaration set out ten different respects in which appellant failed to comply with the law, and it alleged that by reason thereof her husband lost his life. She recovered a verdict and a judgment for $4,000, from which the company appeals.

Mine No. 1 is situated in a deep valley, close to a steep bluff west thereof. In the operation of the mine there was brought to the top coal, earth and rock, in pit cars, elevated to the top in a cage, and taken off the cage at the top. Some years before the accident in question appellant had established a dump for the earth and rock a little distance away from the mouth of mine No. 1; had laid a track up an incline upon which to convey cars containing earth and rock, to be dumped at the top of the incline and returned to the

bottom of the incline, near the mouth of the mine, and had established an engine, having a drum around which a cable was run, connected with said car, and the car was operated by this engine in going up the incline, and then allowed to run down the incline by gravity, restrained by a brake on the drum, which brake was operated by the engineer. The engine had been set with reference to this work upon the rock dump, and a building had been built over the engine after it was set. The engine was about thirty years old at the time appellee's husband was killed. The building was so constructed and the machinery so located that the operator could work the engine and all its appliances and at the same time look at the car ascending and descending upon the rock dump incline. Afterwards it was found desirable to convey to the top of the bluff coal designed for retail trade in Spring Valley, and by the aid of another cable wound upon another drum on the other side of this same engine, cars loaded with coal were taken up another track, laid up the side of the hill to its top, where they were dumped. These cars were operated by the same engine and engineer that operated the rock dump, but because the track ran in a different direction up the hill from that which went up the rock dump, the engineer could not stand in his proper place to see and operate all the machinery, and at the same time watch the ascent and descent of the car going up the retail track. Afterwards appellant installed another engine for the rock dump incline, and thereafter the engine and appliances already described ceased to be used in connection with the rock dump, and were used solely to take cars of coal up the incline to the retail coal dump at the top of the hill and to bring empty cars back to the foot. When cars of coal from the bottom came to the top of the mine and were run off the cage, they were run to the south over a place provided for weighing. Those cars designed for the wholesale

trade were there dumped and the coal was weighed and then passed over a shaker screen, and delivered upon railroad flat cars underneath. Pit cars loaded with coal designed for the retail trade, were passed over this weighing place without being weighed or dumped, and then run back north on a switch past the top of the mine, to a point about twenty feet from the mouth of the mine, and there weighed and dumped into a car stationed on the retail incline track and having the capacity of two pit cars, and when this car had received about 5,500 pounds of coal it was then hauled to the top of the bluff and there dumped, and the empty car was then let down the incline. The plaintiff's proof tended to show that it was necessary, or at least proper and customary and the nearly or quite universal practice, for the engineer to watch the car as it went up the hill, so as to stop it when it reached the dump, and also to see that it was properly dumped, and also to watch it as it came down the hill. When the car started to come down, the engineer shut off the power, to save the expense of letting it down by steam, and allowed the car to come down by gravity, and in the operation of letting a car come down the hill it was necessary for him to use one hand and one foot. To stop the application of the steam power it was necessary to pull a lever which threw the machinery out of gear, and there was no way provided for keeping it out of gear except for him to hold the lever with one hand. At the same time it was necessary for him to apply the brake to the drum over which the twisted wire rope or cable wound and unwound which was attached to the descending car. This application of the brake was made by the engineer by pressing his foot upon a foot lever. When the drum was in gear the hand lever for taking and keeping the drum out of gear and the foot lever for applying the brake to the drum were about as far apart as a man could reach. The cable passed through an opening in

the side of the engine room some two or two and one-half feet wide from side to side, eight or ten inches high, and a little over five feet above the floor of the engine room, and its width from side to side was to permit the play of the rope from one side to the other of the drum as it wound and unwound thereon.  The jury were warranted in finding from the proof that in order to watch the car as it descended it was customary and reasonably necessary for the engineer to look through this same aperture, holding on with one hand to the lever which held the drum out of gear and keeping his foot upon the brake and the brake thus applied and under his control, and while doing these things to also turn his head in the opposite direction from the drum and engine.  When he did this his head was within a few inches of the wire cable, which cable, if the speed became at all rapid, the proof shows would sway violently from side to side.  Appellee's husband was alone in the building, and had just sent a car of coal to the top of the hill and caused it to be dumped, and was letting it down the hill. All that happened is perhaps not known, but a rod which held the foot brake to the floor broke, the car ran down without being held in check by the brake, the brake lever was found lying on the floor, the clutch lever, six feet and two or three inches long, was bent over near the floor, the wire rope was found tangled about the drum and lying on the floor, the boards on the side of the building where the opening was were broken in, and the engineer was found lying on the floor, with his feet at the place where he must have stood to hold his levers and look through this opening in the wall.  His skull had been torn off, and he was otherwise very seriously hurt, and he died soon after. Apparently, when the bolt which held the foot lever broke he lost control of the car and it descended with great rapidity, and the cable swayed from side to side and struck the engineer on the side of his head.  If,

however, the bolt did not break first, but as one of the results of the catastrophe, yet those results were plainly attributable to the existing dangerous conditions.

The main contention of appellant is that the place where appellee's husband worked was not a part of the mine, and that the statute relating to Mines and Miners, chapter 93 of the Revised Statutes, being the act solely relied upon in the declaration, is not applicable to this case, and that nothing in that statute gives a right of action to appellee. Section 34 of said act provides that the words "mine" and "coal mine" in said act are intended to signify any and all parts of the property of a mining plant, on the surface or underground, which contribute, directly or indirectly, under one management, to the mining or handling of coal.

That act contains many provisions applicable above ground. The mine manager is required to "see that all dangerous places above and below are properly marked, and that all danger signals are displayed wherever required." The buildings used for housing the hoisting engine or boilers are required to be fireproof and to be at least sixty feet from the main shaft and a like distance from any building or inflammable structure connected therewith. The act contains many regulations of the boilers and their use. It requires all blasting powder and explosive material to be stored in a fire-proof building on the surface and a safe distance from all other buildings. It provides for a top man, and for a record to be kept at the top. It requires scales to be kept for the weighing of the coal taken from the mine. It provides for rules to be posted on the engine house. All these provisions relate to the surface of the ground, and not to the bottom of the shaft. Indeed, the title of the act includes "coal mines and subjects relating thereto." It is obvious that the general assembly did not intend this act to be effective only beneath the surface, but that

it meant by this act to legislate with reference to all parts of the mining plant which contribute, directly or indirectly, to the mining of coal and to the handling of it from the mine, both below and above ground.

It is argued that the constitution prohibits special legislation, except, so far as relates to this subject, that it makes it the duty of the general assembly to pass such laws as may be necessary for the protection of operative miners; that appellee's husband was not an operative miner, and under the constitution the legislature had no power to pass special acts of this kind relating to any but those who work beneath the ground. If it be meant to contend that so much of said section 34 and the other provisions referred to as apply to the surface of the ground are unconstitutional, then appellant's appeal should not have been taken to this court. We have no power to determine constitutional questions, and by appealing to this court appellant has waived the right to raise any constitutional question. Barnes v. Drainage Comrs., 221 Ill. 627. The case of Starne v. People, 222 Ill. 189, was taken direct from the trial court to the Supreme Court, and the constitutional question was thereby preserved for review. We must assume that this statute is constitutional and that the provisions which it contains applicable to that which is on the surface of the ground are constitutional and valid. If it be meant that we should adopt a construction of this act which would be constitutional rather than one which would make the act violative of the constitution, we conceive that we have jurisdiction to determine which of two possible constructions is constitutional. Havens & Geddes Co. v. Diamond, 93 Ill. App. 557 But we cannot reject the plain meaning of the act to make it constitutional. We think it plain that while the greater part of the act relates to the mine beneath the ground, and is designed to protect operative miners, yet it has many important provisions applicable only to that part of the mining

plant which is above the surface, and other provisions designed alike for the safety of employes engaged beneath and above the surface.

If the coal, earth and rock brought up out of the mine were left at the mouth of the mine, it would very soon be so encumbered that the operation of the mine would be prevented. The proof shows that it is essential to the operation of the mine that the material brought out shall be removed some considerable distance from the mouth of the mine. It seems to us obvious that the operation of the cars containing rock and earth up the incline to the top of the rock dump was a part of that which was essential to operate the mine. But for the use of the rock dump the mouth of the mine would soon become inaccessible, and coal could not be taken out. When, therefore, this engine was used to carry rock and earth up one incline and also coal designed for retail trade up another incline, its operation was a part of the operation of the mine and within the protection of the statute when it was operating a car on the rock dump incline. Will it be said it was not equally in the service of the mine, and was not equally a part of this mining plant and used in the handling of coal, when operating the car of coal from the pit car dump to the other dump at the top of the adjacent bluff? When the machinery was used for both inclines the engineer frequently took a loaded car up one incline with one cable over one drum, at the same time that he let another car down the other incline by the other cable over the other drum attached to the same engine. Was one side of this engine a part of this mining plant, and the other side not a part of it? We conclude its entire operation was a part of this mining plant, which contributed directly or indirectly to the mining or handling of coal. The fact that it was afterwards withdrawn from service in hoisting rock and earth to that dump does not change the situation. We see no reason why that part

of the machinery which carried a part of the coal to the top of the hill was not equally part of the appliances by which the product of the mine was removed from about the immediate mouth of the mine so that mining operations could go on underneath. The power to operate this engine was derived from the same boilers which furnished the steam to raise the cage from the bottom of the mine. These boilers were within the express language of this act. This engine and engine house were much nearer the mouth of the pit or shaft than the house containing the engine and boilers which operated the cage in the shaft and brought the coal out of the mine. The length of the tramway from the place where the retail coal was weighed and first dumped to the top of the hill, where it was dumped again, was only two hundred and eighty-two feet as we understand the record, and it was much shorter than the tramway to the top of the incline dump. The entire plant, including the engine and appliances here in question, was under one management. We consider this machinery and these appliances by which the coal was taken away from the immediate mouth of the shaft and dumped at the top of the hill as much a part of the mine as the other machinery which carried other cars to the south and dumped them and weighed the coal and carried the coal over a screen and delivered it into flat cars upon railroad tracks.

There is no pretense that the machinery upon which appellee's husband was employed was examined, inspected and treated as required by the various provisions of the mining act. Some employe or officer of the company had looked at this machinery not long before, and had made something of an examination of it ten days or two weeks before, but he was not a licensed examiner, nor had there been any such examination as the law requires, or any dangerous places marked or such signals displayed as the law requires,

nor had appellant intended to treat the law as applicable to these appliances. So far as can be discovered, the accident was caused by the breaking of the bolt which held one end of the brake appliances to the floor, thereby releasing the brake and permitting the car to descend with great rapidity, and the wire rope to rapidly unwind and coil up in the engine room, and strike the engineer a deadly blow. It may well be that that defect would have been discovered by such an examination as this law required. If, however, the bolt did not break first, yet the accident was plainly attributable to the existing dangerous conditions. It was a very dangerous position that the operator had to assume in controlling this machinery and at the same time turning his head and looking in another direction, through a narrow apperture, with his head close to this wire rope, which at any time was liable to strike him upon the head in case it swayed any from side to side, as the proof shows it would do violently if he lost control of the car while it was descending. The proof showed that there could be, and had at one time been, an apparatus to hold the clutch out of gear while a car was descending without requiring it to be held constantly by the engineer. In all these respects, and in several other of the ten specifications in the declaration of dangerous conditions, the place where the engineer was required to work could have been made much safer; and a compliance with the statute would have been likely to result in changes favorable to the safety of the engineer, and the proper marking of dangerous places and the display of danger signals would have protected the engineer. Appellant did not deem the statute applicable to this engine room, and did not intend to comply with the provisions of the statute, and its failure was wilful in the sense of the statute.

The view we have taken disposes of most of the objections made to the rulings of the court upon the tes-

timony and upon the instructions. Appellant tried the case upon the theory that this was not a part of the mine, and that this statute was not applicable to the place where appellee's husband was at work. The trial judge treated this as a part of the service of the mine, and if we are right in holding that he was correct in that conclusion, he was also correct in most of his rulings. Objection is made to certain questions appellee was permitted to put to witnesses. Many of these were upon cross-examination, and the direct examination had opened the door for the inquiry. It is said the damages are excessive, but we find no cause to so hold. This claim that the damages are excessive is based upon the fact that one of the children mentioned in the declaration was working for wages. All these facts were shown to the jury. The instruction on the measure of damages was not erroneous, and did not exclude from the consideration of the jury the fact that said child was earning wages. The other rulings complained of were generally correct. We find no reversible error in the record. The judgment is, therefore, affirmed.

*Affirmed.*