THE SPRING VALLEY COAL COMPANY

*v.*

ANNIE GREIG.

*Opinion filed April 18, 1907.*

1. MINES—*duty of examination and inspection is not limited to the shaft and underground work.* The duty of examination and inspection imposed by statute upon mine owners and operators is not limited to the shafts and portions of the mine which are under ground, but includes machinery and other appliances used in removing coal and other material from around the top of the mine so as to keep the top in proper condition, including stationary engines used to haul coal to the retail dump and bring back the empty cars by means of cables. (*Starne* v. *People,* 222 Ill. 189, distinguished.)

2. SAME—*what is not a compliance with law requiring inspection.* The facts that the top foreman of a mine was in the room of the engine operated by the deceased the day the accident occurred and saw nothing wrong, and that another employee who had been instructed by the top foreman to look after the machinery had been there the day before the accident and found the machinery in good condition, do not constitute a compliance with the statute requiring examinations to be made by a licensed mine examiner nor exempt the mine owner from liability for willful violation of the statute.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Bureau county; the Hon. S. C. STOUGH, Judge, presiding.

This is an appeal from a judgment of the Appellate Court affirming a judgment of the circuit court in favor of appellee for $4000.

The following statement of facts made by the Appellate Court in its opinion is a correct and fair statement:

"Appellee sued the Spring Valley Coal Company to recover damages caused by the death of her husband. The case was tried upon the first and second counts of the declaration, which alleged that appellant owned and operated a coal mine, known as Mine No. 1, at Spring Valley; described minutely the machinery and appliances involved in this case; charged that appellee's husband, James Greig, was in appellant's employ as engineer of the retail chute engine, and that it was the duty of appellant and its officers and representatives operating and managing the mine to comply with the statute of the State of Illinois relating to coal mines, and not to willfully fail to comply with any of its provisions, and to see that all dangerous places above and below were properly marked and danger signals displayed wherever required, and that at the date of her husband's death, and for a long time prior thereto, defendant wrongfully and willfully failed and neglected to cause the dangerous places in said declaration described to be properly marked and to cause danger signals to be displayed thereat, and the declaration set out ten different respects in which appellant failed to comply with the law, and it alleged that by reason thereof her husband lost his life. She recovered a verdict and judgment for $4000, from which the company appeals.

"Mine No. 1 is situated in a deep valley, close to a steep bluff west thereof. In the operation of the mine there was brought to the top, coal, earth and rock, in pit cars, elevated to the top in a cage and taken off the cage at the top. Some years before the accident in question appellant had established a dump for the earth and rock a little distance away from the mouth of mine No. 1, had laid a track up an incline upon which to convey cars containing earth and rock, to be dumped at the top of the incline and returned to the bottom of the incline, near the mouth of the mine, and had

established an engine having a drum around which a cable was run, connected with said car, and the car was operated by this engine in going up the incline and then allowed to run down the incline by gravity, restrained by a brake on the drum, which brake was operated by the engineer. The engine had been set with reference to this work upon the rock dump, and a building had been built over the engine after it was set. This engine was about thirty years old at the time appellee's husband was killed. The building was so constructed and the machinery so located that the operator could work the engine and all its appliances and at the same time look at the car ascending and descending upon the rock dump incline. Afterwards it was found desirable to convey to the top of the bluff, coal designed for retail trade in Spring Valley, and by the aid of another cable wound upon another drum on the other side of this same engine, cars loaded with coal were taken up another track laid up the side of the hill to its top, where they were dumped. These cars were operated by the same engine and engineer that operated the rock dump, but because the track ran in a different direction up the hill from that which went up the rock dump the engineer could not stand in his proper place to see and operate all the machinery and at the same time watch the ascent and descent of the car going up the retail track. Afterwards appellant installed another engine for the rock dump incline, and thereafter the engine and appliances already described ceased to be used in connection with the rock dump and were used solely to take cars of coal up the incline to the retail coal dump at the top of the hill and bring empty cars back to the foot. When cars of coal from the bottom came to the top of the mine and were run off the cage they were run to the south over a place provided for weighing. Those cars designed for the whole-sale trade were there dumped and the coal was weighed and then passed over a shaker screen and delivered upon rail-road flat-cars underneath. Pit cars loaded with coal de-

226—33

signed for the retail trade were passed over this weighing place without being weighed or dumped, and then run back north on a switch past the top of the mine to a point about twenty feet from the mouth of the mine and there weighed and dumped into a car stationed on the retail incline track and having the capacity of two pit cars, and when this car had received about 5500 pounds of coal it was then hauled to the top of the bluff and there dumped and the empty car was then let down the incline. The plaintiff's proof tended to show that it was necessary, or at least proper and customary and the nearly or quite universal practice, for the engineer to watch the car as it went up the hill, so as to stop it when it reached the dump, and also to see that it was properly dumped, and also to watch it as it came down the hill. When the car started to come down the engineer shut off the power to save the expense of letting it down by steam and allowed the car to come down by gravity, and in the operation of letting a car come down the hill it was necessary for him to use one hand and one foot. To stop the application of the steam power it was necessary to pull a lever which threw the machinery out of gear, and there was no way provided for keeping it out of gear except for him to hold the lever with one hand. At the same time it was necessary for him to apply the brake to the drum over which the twisted wire rope or cable wound and unwound which was attached to the descending car. This application of the brake was made by the engineer by pressing his foot upon a foot lever. When the drum was in gear the hand lever for taking and keeping the drum out of gear and the foot lever for applying the brake to the drum were about as far apart as a man could reach. The cable passed through an opening in the side of the engine room some two or two and one-half feet wide from side to side, eight or ten inches high and a little over five feet above the floor of the engine room, and its width from side to side was to permit the play of the rope from one side to the other of the drum as it

wound and unwound thereon. The jury were warranted in finding, from the proof, that in order to watch the car as it descended it was customary and reasonably necessary for the engineer to look through this same aperture, holding on with one hand to the lever which held the drum out of gear and keeping his foot upon the brake and the brake thus applied and under his control, and while doing these things to also turn his head in the opposite direction from the drum and engine. When he did this his head was within a few inches of the wire cable, which cable, if the speed became at all rapid, the proof shows would sway violently from side to side. Appellant's husband was alone in the building, and had just sent a car of coal to the top of the hill and caused it to be dumped and was letting it down the hill. All that happened is perhaps not known, but a rod which held the foot brake to the floor broke, the car ran down without being held in check by the brake, the brake lever was found lying on the floor, the clutch lever, six feet and two or three inches long, was bent over near the floor, the wire rope was found tangled about the drum and lying on the floor, the boards on the side of the building where the opening was were broken in, and the engineer was found lying on the floor, with his feet at the place where he must have stood to hold his levers and look through this opening in the wall. His skull had been torn off and he was otherwise very seriously hurt, and died soon after. Apparently, when the bolt which held the foot lever broke he lost control of the car and it descended with great rapidity, and the cable swayed from side to side and struck the engineer on the side of his head."

MCDOUGALL, CHAPMAN & BAYNE, for appellant.

WILLIAM HAWTHORNE, and JOHN L. MURPHY, for appellee.

Mr. Justice Farmer delivered the opinion of the court:

Appellant first insists that the trial court erred in not directing a verdict in its favor, and that the Appellate Court erred in not reversing the judgment for that reason. The basis for this contention is, that the place where the deceased was working and the machinery with which he performed his work were no part of appellant's mine, and that appellant was not required by the statute to have it examined for the purpose of determining whether it was a safe place for employees to work in. To quote from appellant's argument: "The principal ground relied upon by the defendant to sustain the motion to take the case from the jury was the fact that the retail engine house in question did not constitute a part of the mine or the mining plant which the mine manager was required to see 'that all dangerous places above and below are properly marked and that danger signals are displayed wherever they are required,' or in which the company was forbidden to permit workmen to enter the mine to work therein except under the direction of the mine manager, until all conditions shall have been made safe." This is the principal question argued and relied upon for a reversal of this case. It is claimed the duties of examination and inspection of the mine required by the statute relate only to that portion of the mine or plant underground, together with the shaft from which coal is taken and men lowered and raised, and when the coal has been hoisted and dumped from the pit cars the mining operations concerned in the work have entirely ceased, and that machinery installed for a convenient handling of it from that time is not a part of the mine.

Section 34 of the act concerning mines and miners, (Hurd's Stat. 1905, p. 1394,) defines the words "mine" and "coal mine" to mean "any and all parts of the property of a mining plant, on the surface or underground, which contribute, directly or indirectly, under one management, to the mining or handling of coal." It is just as necessary, and

the provisions of the act referred to as certainly require, that coal, rock and other material brought up by way of the shaft out of the earth shall be moved away from the shaft as that they shall be brought up out of the rooms and entries of the mine. Many of the provisions of the statute relate to the examination and safeguarding conditions on the top, and appliances for the removal of coal when brought up out of the shaft must be regarded as much a part of the mine as the appliances for bringing it up. No distinction can be made between appliances used for removing coal to the place where it is dumped on steam cars for shipment and those used for removing it to the place where it is dumped for the convenience of the retail trade. In either event it is a part of the mining operation to remove the coal to some place where it will not render unsafe or dangerous to employees any conditions at the top of the mine. Section 2 of the act concerning mines and miners, among other things requires that both the upper and lower landing at the top of each shaft shall be kept clear and free from loose material, and fenced with gates, so as to prevent either men or material from falling into it; and paragraph "d" of section 16 makes it the duty of the mine manager to "see that all dangerous places above and below are properly marked, and that danger signals are displayed wherever they are required." It would seem machinery and appliances used in facilitating the work of removing coal and other material brought out of the mine and in complying with the requirements of the statute as to the condition in which the top shall be kept are embraced within the statutory definition of a coal mine. The building and machinery at which deceased was employed contributed, "under one management, to the mining or handling of coal," and were therefore a part of the mine.

*Starne* v. *People*, 222 Ill. 189, involved the constitutionality of a statute that is not involved in this case, and what is said there can have no application here.

This engine was originally installed for the operation of appliances to remove to the dump, rock brought out of the mine, and when the incline was built for the removal of coal to the dump designed for retail trade another drum and cable were added and the same engine operated appliances used for that purpose also. Subsequently, and before the accident, another engine was put into use and provisions were made for the removal of the rock to the dump, and the engine the deceased was operating at the time of his death was used only in taking coal up to the retail dump and bringing back empty cars. It was well said by the Appellate Court: "When, therefore, this engine was used to carry rock and earth up one incline and also coal designed for retail trade up another incline, its operation was a part of the operation of the mine and within the protection of the statute when it was operating a car on the rock dump incline. Will it be said it was not equally in the service of the mine, and was not equally a part of this mining plant and used in the handling of coal, when operating the car of coal from the pit car dump to the other dump at the top of the adjacent bluff? When the machinery was used for both inclines the engineer frequently took a loaded car up one incline with one cable over one drum at the same time he let another car down the other incline by the other cable over the other drum attached to the same engine. Was one side of this engine a part of this mining plant and the other side not a part of it? We conclude its entire operation was a part of this mining plant which contributed, directly or indirectly, to the mining or handling of coal. The fact that it was afterwards withdrawn from service in hoisting rock and earth to that dump does not change the situation."

No attempt was made by appellant to comply with the statute requiring an examination by the mine manager of the place and appliances at and with which the deceased was required to perform his work. It is said the top foreman was in the building the morning the accident happened,

while deceased was operating the machinery, and saw nothing wrong with it; also that Bruno Heilgeist, who operated the rock dump engine, had been instructed by the top foreman to examine the machinery for the purpose of keeping it in order, and that he had visited the place for that purpose the day before the accident and found it in perfect condition. This was clearly not a compliance with the law requiring examinations to be made by a licensed mine examiner, and it was not intended by appellant to be a compliance with the statute. If appellant consciously omitted to comply with the statutory requirements this constituted a willful violation of the statute. (*Odin Coal Co.* v. *Denman,* 185 Ill. 413; *Carterville Coal Co.* v. *Abbott,* 181 id. 495; *Donk Bros. Coal Co.* v. *Peton,* 192 id. 41; *Catlett* v. *Young,* 143 id. 74.) If the death of deceased resulted from appellant's willful failure to comply with the statute it would be liable. (*Carterville Coal Co.* v. *Abbott, supra; Catlett* v. *Young, supra; Odin Coal Co.* v. *Denman, supra.*) There was evidence fairly tending to prove the death resulted from such failure, and the question was properly submitted to the jury.

Some complaint is made of rulings of the court in admitting certain evidence. This consisted principally in permitting certain questions asked on cross-examination of the appellant's witnesses by appellee's counsel to be answered over appellant's objections. We are of opinion that it was legitimate cross-examination, and there was no substantial error in the court's rulings in that respect.

The rulings of the court in giving and refusing instructions were in harmony with the law as we understand it, and no error was committed in that regard.

Whether the damages assessed against appellant are excessive is not open to review in this court.

There being no reversible error in the record the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*