## Joseph Fuchs, Appellee, v. Consolidated Coal Company, Appellant.

MINES AND MINERS—*scope of Act*. The words "any dangerous condition" used in the Miners Act are not limited to the dangerous conditions expressly specified in the act or to those of the same kind as those specified; the Act is broad enough to cover dangerous conditions existing at the top as well as at the bottom of a mine.

Action in case for personal injuries. Appeal from the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding. Heard in this court at the March term, 1910. Affirmed. Opinion filed August 5, 1910.

WISE, KEEFE & WHEELER, for appellant.

WEBB & WEBB, for appellee.

MR. PRESIDING JUSTICE HIGBEE delivered the opinion of the court.

By this appeal appellant seeks to reverse the judgment of the circuit court of St. Clair county, in favor of appellee for damages on account of injuries received by him, while working for appellant in its coal mine in Madison county, Illinois, on July 20, 1907. On the trial the following facts were shown: The shaft to appellant's mine in question was some 18 feet square and was sunk to a depth of 185 feet. There were up-right timbers extending from the bottom of the mine to the surface in each corner of the shaft opening, and similar timbers in the middle of the north and south sides of the same. To the latter, extending from one to the other were attached cross timbers eight to ten inches square and some twelve inches apart, called bunting. The partition created by the bunting divided the shaft into two parts called the east and west chambers. In each one of these chambers a cage was carried up and down between the bottom of the shaft and the top of the tipple some fifty feet above the surface, where there was a coal chute, and between the buntings, which were arranged in order one above another, spaces were left in order to allow air to pass from one chamber to the other as the cages ascended and descended. At the bottom of the shaft under each cage landing, was a hole six to ten feet deep called the sump, into which water drained. The bottoms of the cages were platforms, which extended to about three inches of the sides of the chambers and upon them were tracks for the coal cars. Above the platforms some ten feet so that they would be over and out of the way of the loaded cars, were iron hoods to the cages, the purpose of which was to protect the men below from anything falling down the shaft. These hoods did not extend as close to the walls of the chambers as the platforms, but left spaces of from six to twelve

inches at the sides. In the operation of the cages it was so arranged that while one of them was being hoisted the other would be descending. At the top of the tipple was a device by which the contents of a loaded car would be automatically unloaded into the coal chute. In the operation of unloading the car, a catch would raise the back of the platform pitching the car forward and emptying it through the door into the chute. While this was going on men at the bottom of the shaft would be engaged in pushing a car onto the cage in the other chamber of the shaft. Above the surface of the ground the cross timbers formed a division wall between the two chambers of the shaft until a point was reached near where the coal was dumped from which place the partition was constructed as a solid wall. This wall extended a few feet below the place where the coal was dumped and was higher than the top of the coal car, the object being to prevent coal from falling from one chamber into another while being dumped. There was however an opening between the side of this wall and the cage, about eight inches wide and eight feet long, through which coal frequently fell, while the car was being dumped. The most of the coal so falling, would go straight down the shaft into the sump under that chamber of the shaft in which the car was being emptied, but often large pieces would strike the cross wall at the surface, go down on the other side of the partition and pass between the iron hood and the side of the shaft, to the platform of the empty cage, then being loaded.

On the day of the injury, appellee, who was a laborer at the bottom of the mine, had temporarily taken the place of a cager, and while he was engaged in assisting to push a car on a cage in the east chamber of the shaft, a large piece of coal fell from the cage which was being unloaded above, crossed over into the shaft where he was engaged, struck him upon the arm, which it broke, and inflicted permanent injuries.

The seven counts of the declaration charged appellant with a wilful disregard of the provisions of the Miners Act,

in failing to mark the bottom of the mine as dangerous or display a danger signal there; in permitting appellee to enter the mine until all conditions had been made safe; in not placing a danger mark at the tipple; failure on the part of the mine examiner to examine the working places and make a record of the condition of the mine and ·in omitting to go into the mine before men were permitted to enter and place a conspicuous mark at all unsafe places; failure on his part to observe the dangerous condition of the shaft and tipple, and failure to keep the top of the shaft so that material from it would not fall therein to the ·bottom and injure the miners. General issue pleaded, verdict and judgment for appellee for $832.08.

The proofs show, and appellant does not deny, that appellee was injured without fault on his part; that the place where he was injured was dangerous and unmarked, and that the dangerous point on the tipple, where the coal was dumped, was also unmarked. It is insisted, however, by appellant, that the proofs failed to show a wilful, or any, violation of the statute and also failed to show that a wilful violation of the statute was the proximate cause of the injury. It is further contended by appellant, that all self-dumping cars would lose some coal in the process of being emptied; that such loss was unavoidable; that it was not practicable to make the iron hoods on the cages fit closer to the sides of the shaft than they did; that the tipple was constructed in the usual manner in general use where self-dumping cars were employed; that the equipment and material of the tipple were first class in every respect; that a self-dumping cage could not be used that would positively prevent coal from falling to the bottom of the shaft; that the timbering of the shaft was done in accordance with the best known methods of timbering shafts and that it was impossible to have a solid partition in the shaft from the surface of the ground to the pit bottom; that the whole question of the construtcion of the tipple and the placing of the bunting, was not a question of fact to be submitted to a jury, but was an engineering or mechanical question; that

it was the duty of the court to take the case from the jury on a motion of appellant and direct a verdict in its favor.

Appellee sought to controvert some of the positions taken by appellant, by introducing evidence tending to show that the hoods over the cages might be made wider so as to leave less space next to the sides of the shaft and also that the construction of a solid partition from the top of the shaft to connect with the solid wall in the upper part of the tipple would not interfere with the operation of the cages and would be an element of safety.

Appellant to sustain its position that the question was an engineering or mechanical question, and that having used well known processes of construction in general use among mine operators, for like purposes, it should not be held liable, relies upon C. & E. I. R. R. Co. v. Driscoll, 176 Ill. 330, and other cases, where it is held that certain methods of construction and operation of railroads are engineering questions and not subject to the review of a jury, and other cases which hold that the employment of methods of construction in general use in business, tends to rebut a charge of negligence, growing out of such use.

The question of the negligence of appellant is not at issue here however, and therefore we do not think the cases referred to are applicable. The charge in the declaration is the wilful violation of certain provisions of the Miners Act, and failure to comply with the same was clearly shown by the proofs in the case, and does not appear to be contested by appellant. The falling of coal from the top of the tipple made the place where appellee was injured dangerous and continually subjected the men employed there to serious injury. The dangers of the situation were known to appellant and it should have provided for the safety of its employes in the manner set forth in the statute, unless it can be said the Miners Act does not apply to cases like this.

The Supreme Court of this state have, however, held that the words "any dangerous condition" used in the Miners Act, are not limited to the dangerous conditions expressly specified in the act or to those of the same kind as those specified

and also that the act is broad enough to cover dangerous conditions existing at the top as well as at the bottom of the mine. Dunham v. Black Diamond Coal Co., 239 Ill. 457; Spring Valley Coal Co. v. Greig, 226 Ill. 511.

We conclude from the authorities just mentioned, that the circumstances relied on by appellee and shown to exist by the evidence in this case, were such as to render the provisions of the Miners Act applicable.

The evidence in the case also shows facts from which the jury might reasonably find that the failure of appellant, to comply with the provisions of the law as charged in the declaration, was the proximate cause of the injury to appellee.

The judgment of the trial court should be, and it accordingly is, affirmed.

*Affirmed.*