# Ella N. Sheppard, Appellee, v. Marquette Third Vein Coal Mining Company, Appellant.

## Gen. No. 5522.

1. MINES AND MINERS—*paragraph (i) of section 4 construed.* In the term "boilers" as used in paragraph (i) of section 4 are included all pipes and connections between a boiler and a steam chest or engine.

2. MINES AND MINERS—*section 4 of act construed.* Under section 4 of the Mines and Miners Act it is the duty of the operator to have the machinery in the mine inspected daily by the mine examiner and a record made of the conditions.

3. MINES AND MINERS—*what wilful violation. Held,* that a failure to have boilers and connections examined and a report made of conditions as required by statute, was wilful and rendered the operator liable irrespective of whether the deceased miner was in the exercise of due care.

4. MINES AND MINERS—*what not proximate cause. Held,* in this case, that the absence of the engineer from the hoisting engine was not the proximate cause of the death upon which the action was predicated.

5. ORDINARY CARE—*presumption arising from habits of care. Held,* that it was a reasonable presumption from the character and habits of the deceased that he did what ordinary care for his own safety would require and that he had been accustomed to do.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Bureau county; the HON. R. M. SKINNER, Judge, presiding. Heard in this court at the April term, 1911. Reversed and remanded. Opinion filed October 13, 1911.

**Statement by the Court.** Appellee sued appellant to recover damages for the death of her husband which it is averred was caused by appellant's wilful violation of the Miners Act. Each count of the declaration contains a general description of the mine both at and below the surface of the ground and avers that the surface workings consisted of divers buildings, a boiler house, a battery of boilers, a hoisting engine house, a hoisting engine and appliances, a dynamo engine house,

a dynamo engine to run an electric railway underground, fan, etc., with appliances, pipes and apparatus and a connection called a separator; that the husband of appellee was a legally qualified and certified hoisting engineer, and as an employe of appellant operated the hoisting engine and the dynamo engine; that no person was in charge of the dynamo engine; that the pipes and appliances were out of repair; that the deceased was unlawfully required to leave the hoisting engine and to attend the dynamo engine when there were men underground; that the boilers were out of order and had not been examined by a competent boiler-maker or qualified person within six months prior to the accident which caused the death of appellee's husband, and the examination reported to the state inspector as required by law; that the dynamo engine was not equipped with a suitable trap and that the pipes and appliances were old and worn out. The negligence averred in the first count is that appellant wilfully failed to have the boilers examined and inspected by a competent boiler-maker or qualified person, and wilfully failed to have such examinations reported to the inspector, so that the boilers were out of order, by reason whereof there was an explosion and the husband of appellee so injured that he died. The negligence averred in the second count is that the appellant wilfully permitted the deceased to enter the dynamo engine house not under the direction of the mine manager before all conditions had been made safe. The third count avers that a danger signal was required in the dynamo engine house, yet appellant's mine manager wilfully failed to see that a danger signal was displayed thereat. The fourth count avers that the mine manager wilfully failed to have the dynamo engine house, engine and appliances, examined every morning by the mine examiner before the men were allowed to go to work and before deceased was allowed to enter said engine house. The sixth count avers that the mine examiner wilfully

failed to examine said engine house, engine and con-
nections.    Other counts were restatements of these.
The appellant filed the general issue, and on a trial
the appellee recovered a verdict and a judgment for
$4000.

The plant of appellant consisted among other things
of a one story brick boiler room, eighty feet in length,
east and west, by forty feet in width north and south,
in which are located five boilers with a steam pressure
gauge on each boiler.  East of and adjoining the boil-
er room is a two story building, in the second story of
which is the hoisting engine, which furnishes power to
move the cages in the shaft.  The hoisting engine room
is forty to fifty feet long east and west and is one hun-
dred and fifty feet east of the main shaft.  On the south
side of the engine room is a doorway and leading there-
from is a stairway running east on the outside of the
building.  East of and adjoining the hoisting engine
house, and between it and the shaft, is a one story dy-
namo engine house in which is located the dynamo en-
gine used to furnish power to run the dynamo which
runs the electric cars in the mine and lights it.  The
dynamo engine room is fifteen feet east and west by
forty-four feet north and south and extends ten feet
south of the south wall of the hoisting engine room.
In the west wall of the dynamo engine room, extending
south of the hoisting engine room, is a door which is
fourteen feet from the foot of the stairway leading
up to the hoisting engine room.  The distance from
the throttle of the dynamo engine to the west door out
of the dynamo room is twenty and a half feet.  The
distance from the bottom of the stairway to the top
is twenty-one feet.  The distance from the door of
the hoisting engine room to the throttle of the hoisting
engine is twenty and one half feet.  The route from
the throttle of the hoisting engine to that of the dynamo
engine is down the stairway, a distance of sixty-two
feet.  The distance from the hoisting engine to the boil-

ers is about one hundred feet and down the same stairway.

The steam from the boilers is conveyed to a steam dryer in the east end of the boiler room and thence through pipes throughout the plant. One pipe seven inches in diameter leads from the dryer through the south wall of the boiler room thence east ninety-seven feet on the outside of the building, thence through the west wall of the dynamo engine room, thence six feet further east, and there connects with an elbow with a seven inch pipe leading perpendicularly down to the steam chest of the dynamo engine. This pipe from where it leaves the boiler room is on the outside of the building but is covered with asbestos and wooden boxing. Where the pipe runs through the west wall of the dynamo room it rests on the brick wall, and eighteen inches inside the dynamo room the pipe runs into an Austin steam separator. On the side of the separator and connected with the inside of it is a twelve inch water gauge to show the amount of water collected in it. The steam separator is made of cast iron and weighs about four hundred pounds, and is eleven and one half inches in width and twenty-eight inches deep inside. The purpose of the separator is to catch the water arising from the condensation of steam in the pipe leading from the dryer to the dynamo engine. In the separator is a trap with a hole in the bottom for the purpose of draining the water from the trap. A one and one-half inch pipe leads from the bottom of the trap to a drain and in this pipe within reach of the engineer standing at the dynamo engine is a wheel controlling a valve which drains the water through this pipe. There are also two pet cocks in the bottom of the dynamo steam chest which are always kept open when the engine is running and through which condensed steam or water which had got into the chest and in the pipe up to the separator would drain out. The throttle of the dynamo engine is in the seven inch

perpendicular pipe leading down to the steam chest, and before opening the throttle of the dynamo engine the engineer should open the valve which drains the steam separator.

The signals for the operation of the hoisting engine to move the cages in the shaft were given from underground by a pneumatic device which gives the signals in three places, namely, an eight inch gong which rang in the engine room, a whistle which sounded in the boiler room and another gong in the tipple.

In April, 1909, the working hours at appellant's plant were divided into three shifts. The deceased was a licensed hoisting engineer who had been in the employ of appellant sixteen years and was at the time of the accident the hoisting engineer on the third shift, from 11 o'clock P. M. to 7 o' clock A. M. during which time no coal was hoisted, the miners going to work at 6:30 A. M. and leaving at 3:30 P. M. During the third shift and while the deceased was in charge of the hoisting engine there were from nine to sixteen men underground cleaning up and brushing the mine for the next day's work, with the mine examiner who made his examination for the next day during that shift. During this shift the cages were ordinarily only moved once or twice. The deceased was required to attend to and operate the hoisting engine and the dynamo engine during that shift, while the mine examiner and the few men engaged in cleaning up and brushing the mine, to have it ready for work the next morning, were underground, and to assist the firemen when he was cleaning and washing out the boilers.

The deceased went to work at the usual hour on the night of April 27, 1909, helped the fireman about three-quarters of an hour to wash the boilers, and stayed in the boiler room until about 2:30 a. m., when a signal was given to hoist the cage; he then went to the hoisting engine room and was not seen again until 4:30, when the fireman threw a piece of coal at the engine

room door and the deceased whistled to the fireman and came from the engine room, hitched up a mule for the fireman and then went to the dynamo engine room. A few minutes thereafter the fireman heard an explosion and going to the dynamo engine room found the door open, the steam separator burst open lengthwise, the steam pipe between the separator and the steam chest burst, the steam blowing out, and the deceased crawling out of the room so badly scalded that he died during that day. At the time of the explosion there was a steam pressure of seventy-five pounds. The boilers had not been examined by a competent boiler-maker or other qualified person not an employe of appellant and the result reported to the inspector, within eighteen months. The mine manager did not have any examination made by the mine examiner of the boilers, their connections, the hoisting engine or the dynamo engine, and made no record of the conditions of the boilers, connections and engines.

CAIRO A. TRIMBLE, for appellant.

J. L. MURPHY and J. L. SPAULDING, for appellee.

MR. PRESIDING JUSTICE GEORGE W. THOMPSON delivered the opinion of the court.

Appellant contends that the bursting of the steam separator and pipe was caused by the deceased negligently turning steam into the dynamo engine without first draining the water out of the steam pipe and the Austin separator, that his death was caused by his own negligence, and that the explosion of the steam separator and pipe was not caused proximately or otherwise by any of the violations of the statute charged in the declaration. The appellee contends (1) that appellant wilfully failed to have the boilers and connections examined and inspected by a competent boiler-maker or other competent person not an employe of appel-

lant as required by law; (2) that appellant wilfully allowed deceased to enter the dynamo engine room, which it is claimed was an unsafe place, not under the direction of the mine manager before all conditions had been made safe; (3) that the mine manager wilfully failed to see that the dynamo engine room was properly marked and a danger signal displayed calling attention to the condition; (4) that the appellant wilfully failed to have the engine house examined every morning and to make a daily record of such examination before the men were allowed to go to work and the engineer to enter such engine house, and (5) that appellant wilfully failed to require the deceased to be in constant attendance at the hoisting engine and required him to be away from the hoisting engine and at the dynamo engine while men were underground.

It was the duty of the appellant under paragraph (i) of section 4 of the Miners Act to have all boilers used in generating steam in and about the mine kept in good order, and to have the boilers thoroughly examined and inspected by a competent boiler-maker or other qualified person not an employe of the appellant as often as once in every six months, and the result of every such inspection shall be reported on suitable blanks to the state inspector. We are of the opinion that in the term boilers are included all pipes and connections between the boilers and the steam chest or engine. There had been no inspection whatever of the boilers by any person not an employe of appellant made as the statute requires for over a year prior to the accident.

Section 34 of the Miners Act provides: "In this act the words 'mine' and 'coal mine', used in their general sense, are intended to signify any and all parts of the property of a mining plant on the surface or underground, which contribute directly or indirectly under one management, to the mining or handling of coal." Section 18 of the same act prescribes the du-

ties of mine examiners, among which are "to visit the
mine before the men are permitted to enter it." * * *
"He shall then inspect all places where men are ex-
pected to pass or to work and observe whether there are
any recent falls." * * * (c) "The mine examiner shall
make a daily record of the conditions of the mine, as
as he found it, in a book kept for that purpose which
shall be preserved in the office for the information of
the company, the inspector and all persons interested,
and this record shall be made each morning before the
miners are permitted to descend into the mine." In
Spring Valley Coal Co. v. Grieg, 226 Ill. 511; 129 Ill.
App. 386, it was held that this provision of the statute
covered a stationary engine situated at the top of the
mine, used to furnish power to haul coal cars to the
retail dump and to bring back empty cars by means of
a cable. It was said that the duty of examination or in-
spection imposed by statute upon mine operators is not
limited to the shafts and portions of the mine which
are underground but includes machinery and other ap-
pliances used in removing coal and other material from
around the top of the mine, including stationary en-
gines used to haul coal to the retail dump. Under this
holding we must hold that it was the duty of the appel-
lant to have the machinery inspected daily by the mine
examiner and a record made of the conditions.

The deceased was in the dynamo engine room for
between five and ten minutes before the explosion. He
was an experienced engineer, having for five years per-
formed the same duties at appellant's plant that he was
performing on the morning he was injured. The acci-
dent was not seen by any person. It is a reasonable
presumption from his character and habits that the
deceased did what ordinary care for his own safety
would require and that he had been accustomed to do.
I. C. R. R. Co. v. Nowicki, 148 Ill. 29; I. C. R. R. Co.
v. Prickett, 210 Ill. 140. The proof shows that the
steam pressure on the boilers at the time of the acci-

dent was not excessive. It cannot be told with any certainty what was the cause of the explosion. If the boilers and their connecting steam pipes, which include the Austin separator and pipe which burst, had been properly examined before the accident some trouble or defect might have been discovered which could have been remedied and so have prevented the accident. The failure to have the boilers and connections examined and a report made of the conditions as required by statute was wilful and the statute makes appellant liable for all damages resulting from such wilful neglect irrespective of whether the deceased was in the exercise of due care or not.

Instruction 14, given at the request of appellee, states that if the jury believe from the evidence the dynamo engine house, dynamo engine, pipes, appliances and separator were a part of the appellant's mining plant, and that the dynamo engine house was a dangerous place, and that appellant wilfully allowed deceased to enter said engine house and operate the dynamo engine not under the direction of the mine managers before all conditions had been made safe, and that deceased was the only hoisting engineer on duty at the mine, then the appellant was guilty of a wilful violation of the statute and if the jury believe such wilful violation of the law occasioned the death of deceased then they should find appellant guilty, even though they believe deceased neglected to drain the separator before starting said engine. That part of the instruction which recites if the jury believe the deceased "was the only hoisting engineer on duty" was immaterial and liable to mislead in view of some of the contentions of appellee, but we see no objection to the remainder of the instruction.

Concerning the contention of appellee that appellant wilfully failed to require the deceased to be in constant attendance at the hoisting engine, and required him to be away from the hoisting engine and at

the dynamo engine while men were underground, we hold that the absence of the engineer from the hoisting engine was not the proximate cause of his death. The evidence shows that at one time it was the duty of the hoisting engineer to leave his post and go to the railroad track to pick up a mail sack. It cannot reasonably be contended that if on one of such trips he had been struck by a train and killed, that leaving his hoisting engine was the proximate cause of his death. Or if it was a part of his duties to assist the fireman in hitching up the mule, as he did just prior to the injury, and through some negligence of his he had caused the mule to kick him appellant could not reasonably contend that leaving the hoisting engine was the proximate cause of such injuries. The 15th and 16th and part of the 17th instructions given at the request of appellee were based on the theory that the absence of deceased from the hoisting engine was the proximate cause of his death. These instructions were erroneaus and the giving of them was reversible error. What has been said concerning the given instructions of appellee is applicable to some of the refused instructions of appellant and it is unnecessary to further comment upon them. For the errors pointed out the judgment is reversed and the cause remanded.

*Reversed and remanded.*